THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOSEPH SIDBURY, | CASE NO. C14-1446 JCC |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| BOEING, | |
| Defendant. | |

This matter was tried before the Court on November 9 and 10, 2015. The claims presented for adjudication were as follows:

1.  Did Defendant discriminate against Plaintiff because of his race and/or age in violation of the Washington Law Against Discrimination (WLAD), Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act?

2.  Did Defendant retaliate against Plaintiff in violation of WLAD and Title VII because he filed a Boeing Equal Employment Opportunity Complaint?

The Court holds that Defendant neither discriminated nor retaliated against Plaintiff, and finds against Plaintiff on all of his claims.

## I.   FINDINGS OF FACT

### A.   **Plaintiff's Demotion**

1.  Plaintiff Joseph Sidbury is an African-American man in his early sixties and a

1    current employee at Boeing.

2         2.      As a result of an employee death at a Boeing paint shop facility in late 2012,

3    Boeing engaged managers and employees in a series of communications and initiatives to

4    improve workplace safety. At the time, Boeing's 747 production line had a higher workplace

5    injury rate than other Boeing production lines, so extra emphasis on safety was directed at

6    managers and employees on the 747 production line.

7         3.      In early 2013, Sidbury served in a "special assignment" or "business manager"

8    role, where he was expected to assist the team's Senior Manager, Russ Ulrich, in managing all

9    aspects of the production process and activities. Sidbury supervised the team's safety

10   coordinator, had various safety responsibilities, and was expected to be familiar with all aspects

11   of the building process for the aft sections of the 747 fuselage. As a result of safety briefings and

12   other safety activity, Sidbury should have been aware of the heightened emphasis on preventing

13   workplace accidents at Boeing.

14        4.      On May 15, 2013, a group of mechanics was working unsafely in the 48

15   section (the aft-most section) of a 747 fuselage.  The fuselage section was approximately 10

16   feet above the factory's concrete floor.  Several mechanics balanced a roughly 7-foot-tall

17   folding ladder on two legs while one of the mechanics stood on its topmost rung,

18   approximately 15 feet above the concrete floor.  No safety harnesses or other fall protection

19   devices were being used.  All such conduct was in violation of Boeing's safety policies.

20        5.      Anthony Constantino, a Boeing-designated crew safety focal and one of Sidbury's

21   direct subordinates, went to the mechanics' supervisor, Rick Johnson, in an effort to get him to

22   stop the unsafe conduct.  When Johnson refused to respond to Constantino's request,

23   Constantino went to Sidbury and informed him of the unsafe conduct.

24        6.      Sidbury observed the unsafe behavior, agreed that it was unsafe, and asked that

25   Constantino photograph the incident. Although Sidbury asked the mechanics if they could "do

26   better than this," he did not directly order them to stop their unsafe conduct.  Instead, he walked

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 2

away to discuss the matter with Johnson while the unsafe conduct continued.

7.     The photograph taken by Constantino shows Sidbury walking away from the scene as the mechanics continued their unsafe conduct.

8.     Because Sidbury was a manager, he could have ordered the employees to stop their conduct even if Johnson disagreed.

9.     After talking with Johnson for several minutes, Sidbury did not return to the shop floor to instruct the mechanics to stop their unsafe conduct, and did not ask senior management to immediately address the situation.  Instead, Sidbury asked Ulrich's office assistant to include Constantino's photograph as part of the discussion on workplace safety at an upcoming management meeting.

10.     After an HR investigation concluded that Sidbury and Johnson had failed to stop the mechanics' unsafe conduct in violation of Boeing policies, a Boeing Employee Corrective Action Review Board ("ECARB") reviewed the facts and recommended that both Johnson and Sidbury receive a Corrective Action Memo ("CAM") and a five-day unpaid disciplinary suspension.  At the time, Johnson was a white man in his 50s, and Sidbury was a black man in his 50s.

11.     Jerry Mills, Boeing's Director of 747 Structures, reviewed ECARB's recommendation, as he had ultimate responsibility over the area in which Sidbury and Johnson worked.  Mills decided that ECARB's recommendation was insufficient given the seriousness of Sidbury and Johnson's failure to act.  He determined that each of the two supervisors should be removed from management, because each was informed of an egregious safety violation and failed to stop it.

12.     Sidbury's demotion took effect on July 26, 2013, when he was demoted to an industrial engineering position. His annual base pay rate was reduced from $105,300 to $94,770.

13.     Johnson's demotion did not take effect until he returned from medical leave

in August 2013, at which time he was returned to a mechanic position. His annual base pay rate was reduced from $110,350 to an hourly pay rate that translates to an annual base pay rate of $76,107.

### B.    Plaintiff's Performance As a Manager

15.    While Boeing was still conducting its investigation into the safety incident that eventually resulted in Sidbury's demotion, Ulrich decided to reassign two of his front-line managers.  He reassigned Sidbury to supervise a crew of mechanics on the "A-Deck," or mid-level portion of the 747 aft-fuselage, and he reassigned the current A-Deck supervisor, Eric Bay, to fill Sidbury's role as the team's "special assignment" or "business manager." At that time, Sidbury had many years of experience as an aircraft production manager, and had been a member of the 747 Section 46/48 management team for several years.

16.    This reassignment did not involve any change in pay, benefits or job level for either Bay or Sidbury, and both continued to report to Ulrich.  The assignment to manage the A-Deck crew was consistent with the customary job expectations of a K-Level production manager such as Sidbury.

17.    The job of managing a production crew at Boeing is a difficult one, and it can be challenging to keep pace with the production schedule.  When Sidbury assumed responsibility for the A-Deck crew, it was already behind in meeting certain production goals.  The crew's progress deteriorated further after Sidbury took over.  In particular, the number of "traveler" jobs (jobs which have to be completed by the crew after the aircraft moves to the next position on the production line) increased.

18.    As Sidbury's crew fell further behind, Sidbury failed to keep Ulrich apprised of specific production challenges, failed to develop and propose specific and/or effective action plans to meet production objectives, and failed to require his crews to work overtime as necessary to meet those objectives.  Ulrich repeatedly counseled Sidbury in order to address these issues, and provided Sidbury with specific advice about how to more effectively manage

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 4

1    his crew.  Sidbury failed to effectively respond to such guidance.

2         19.    During his assignment on the A-Deck, Sidbury also struggled to effectively

3    communicate with Ulrich.  Ulrich found that Sidbury's verbal communications, and especially

4    his e-mailed or written communications, were often incomplete or difficult to understand.  Ulrich

5    tried to counsel Sidbury about the importance of improving his written communications, but

6    Sidbury failed to effectively respond to such guidance.

7         20.    Eric Bay and Jeff Forshee, Sidbury's former co-workers who were also first-

8    line managers, testified at trial that they concurred with Ulrich's view that Sidbury was not

9    an effective manager.

10        21.    Because Sidbury's crew was consistently behind on its jobs, Ulrich conducted

11   frequent bar chart audits in an effort to more closely monitor its work.  Bay and Forshee testified

12   that this was consistent with the approach Ulrich took with the first-line managers of other crews

13   that were behind on their work.

14        22.    At daily work status (or "boardwalk") meetings, Ulrich found that Sidbury was

15   often unprepared and unable to answer all of Ulrich's questions.  He frequently struggled to

16   clearly explain his crew's progress, so Ulrich would press him for clearer explanations.

17        23.    Sidbury testified at trial that he does not know why Ulrich did not like or respect

18   his work as a first-line manager.  Sidbury also testified that Ulrich treated two other over-40

19   black managers—Ervin Beachum and James Crenshaw—better than he treated Sidbury.

20        24.    Boeing first-line manager Ervin Beachum testified that he worked for Ulrich for

21   approximately 16 months and did not believe that Ulrich treated him or others worse because of

22   race or age.  Beachum testified that Ulrich is an overly demanding supervisor, but is overly

23   demanding of all of his subordinate managers.  Beachum is a black man in his 50s.

24        25.    Bay and Forshee corroborated Beachum's testimony.  Each testified that they too

25   had been subjected to heightened scrutiny by Ulrich, and that each of them had been publicly

26   criticized or challenged by Ulrich in front of other managers and support staff.  This was the

same conduct of which Sidbury complained.  Bay and Forsehee testified that such conduct by Ulrich—conduct that they did not approve of—was either the result of poor progress in building an airplane or a manager's inability to effectively answer Ulrich's questions.  They testified that such conduct by Ulrich was not based on age or race.  Bay is a white man who is under age 40. Forshee is a white man in his 50s.

26.     After Ulrich made numerous attempts to communicate his expectations to Sidbury, and to provide Sidbury with guidance and direction, he concluded that the A-Deck crew's performance was not improving, and that Sidbury's poor job performance was a significant contributor to the crew's failure to timely build the plane.  Ulrich therefore decided to switch the assignments of Bay and Sidbury again.  Sidbury returned to his special assignment role and Bay returned to his A-Deck supervisor role. There was no change in pay, benefits, or status as a result of this exchange of assignments.

### C.     Plaintiff's EEO Complaint

28.     While Sidbury was still managing the A-Deck crew, he filed an internal complaint with Boeing's Equal Employment Opportunity ("EEO") Office. In his complaint, Sidbury alleged that Ulrich discriminated against African-American employees by unfairly targeting them and taking adverse employment actions against them.

29.     Kathy Cho, a Boeing EEO Investigator, interviewed several of Sidbury's co-workers. They did not support his allegations. Based on her investigation, Cho ultimately decided that Sidbury's complaints were unsubstantiated.

30.     Ulrich did not learn about Sidbury's EEO complaint until after his decision to remove Sidbury from his A-Deck assignment and return him to the special assignment position.

31.     Sidbury did not present any evidence at trial to support his assertion that Mills was aware of Sidbury's EEO complaint at the time he made his decision to demote Sidbury and Johnson.

## II.     CONCLUSIONS OF LAW

A.     <u>**Legal Standard for Disparate Treatment Claims**</u>

1.     Sidbury claims that Boeing discriminated against him because of his race and/or age in violation of the Washington Law Against Discrimination (WLAD), Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act (ADEA).

2.     To prevail on his state disparate treatment claim, Sidbury must show by a preponderance of the evidence that discriminatory intent was a substantial factor in an employer's adverse employment action. *Scrivener v. Clark College,* 181 Wn.2d 439, 444 (2014). A "substantial factor" means that the protected characteristic was a significant motivating factor bringing about the employer's decision. *Id.*

3.     To prevail on his federal disparate treatment claims under Title VII, Sidbury must show by a preponderance of the evidence that his age and/or race was a motivating factor in an employment action. *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 856 (9th Cir. 2002).

4.     To prevail on his age discrimination claim under the ADEA, Sidbury must show that his age "actually played a role in Boeing's decision-making process and had a determinative influence on the outcome." *Pottenger v Potlatch Corp.,* 329 F.3d 740, 745 (9th Cir. 2003).

5.     The Court finds that Sidbury failed to meet his burden of demonstrating that Boeing unlawfully discriminated against him because of his race and/or age in violation of WLAD, Title VII, or the ADEA.

6.     Sidbury did not present sufficient evidence to show that Boeing's decisions were motivated by anything other than his poor work performance.

7.     Sidbury did not establish that race and/or age played any part in Ulrich's decisions to move Sidbury in and out of the A-Deck.  Instead, the evidence showed that Ulrich moved Sidbury to the A-Deck to give him the opportunity to directly manage a crew and to improve the crew's performance.  When it became clear that Sidbury was not effectively managing the crew or responding to Ulrich's workplace coaching, Ulrich moved Sidbury out of the A-Deck.

8.      The record does not support a finding that Ulrich "singled out" Sidbury because of his race and/or age.  Instead, the record is clear that Ulrich directed scrutiny at every manager who failed to complete his job, failed to answer Ulrich's questions, or failed to understand his assignment. The evidence presented at trial established that any criticism of Sidbury was the result of his poor communication practices and/or his failure to effectively manage his crew.

9.      The record also does not support Sidbury's assertion that Ulrich or anyone else treated him worse because of his level of education or military record. To the extent that Sidbury's coworkers and superiors were even aware of this information, there is no evidence that they treated him worse because of it.

10.     Finally, Sidbury failed to present evidence that race and/or age played any part in his demotion from management.  Mills credibly testified that he made the decision to demote Sidbury and Johnson because of their respective failures to stop workplace behavior that threatened the safety of Boeing employees.

11.     Sidbury argued that only Johnson should have been demoted, because Sidbury took a picture of the incident while Johnson did nothing. However, Mills and Ulrich credibly testified that there was no practical difference between taking a picture and doing nothing, since Sidbury and Johnson both failed to stop the unsafe behavior. As Mills explained, because Sidbury and Johnson were managers and therefore tasked with ensuring the safety of their subordinates, the fact that both allowed egregiously unsafe behavior to continue meant that both should be demoted. The Court finds no reason to question Mills' explanation.

12.     As such, Sidbury has failed to meet the burden for his disparate treatment claims under WLAD, Title VII, and the ADEA.

### B.      Legal Standard for Retaliation Claims

13.     In order to prevail on his retaliation claim under WLAD, Sidbury must prove by a preponderance of the evidence that his EEO Complaint was a substantial factor in Ulrich's

1    decision to 1) move Sidbury out of his A-Deck position, and 2) demote Sidbury from

2    management. *Allison v. Hous. Auth. of City of Seattle*, 118 Wash.2d 79, 81 (1991).

3         14.    To prevail on his retaliation claim under Title VII, Sidbury must prove that his

4    EEO Complaint was the but-for cause of the challenged employment action.  *Ellorin v. Applied*

5    *Finishing, Inc.*, 996 F. Supp. 2d 1070, 1090 (W.D. Wash. 2014) (citing *Univ. of Tex. Sw. Med.*

6    *Ctr. v. Nassa*r, 133 S.Ct. 2517, 2521 (2013)).

7         15.    The Court concludes that Sidbury has failed to meet his burden of demonstrating

8    that Boeing retaliated against him.  Sidbury failed to provide sufficient evidence to establish that

9    Ulrich's decision to move Sidbury out of A-Deck or Mills' decision to demote Sidbury had

10   anything to do with his EEO Complaint.

11        16.    There is no evidence in the record to support the assertion that Sidbury's EEO

12   Complaint was a factor in Ulrich's decision to move Sidbury out of the A-Deck.  Instead, the

13   evidence establishes that Ulrich was not aware of Sidbury's EEO complaint at the time he moved

14   Sidbury out of his A-Deck supervisory assignment.

15        17.    There is also no evidence in the record to support the assertion that Sidbury's

16   EEO Complaint was a factor in Mills' decision to demote Sidbury and Johnson for failing to

17   appropriately respond to unsafe conduct.

18        18.    As such, Sidbury has failed to meet the burden for his retaliation claims under

19   WLAD and Title VII.

20        It is so ORDERED.

21        //

22        //

23        //

24        //

25        //

26        //

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 9

1    DATED this 24 day of November 2015.

2

3

4

5

6

7

8                                    John C. Coughenour
                                     UNITED STATES DISTRICT JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 10